**AFFIRM; and Opinion filed May 23, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-12-00221-CR**

_____

**ANTWON IRVING AKA RAKIM BARNES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 7**
**Dallas County, Texas**
**Trial Court Cause No. F10-62755-Y**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Murphy, and Fillmore
Opinion by Justice Lang-Miers

Antwon Irving aka Rakim Barnes pleaded not guilty to the offense of murder. A jury found him guilty, and the trial court assessed punishment at life imprisonment. In eight issues on appeal, appellant contends that the evidence is insufficient to support the conviction, the trial court erred by refusing to instruct the jury to disregard certain testimony, the trial court abused its discretion by refusing to declare a mistrial, and the judgment should be modified to reflect the names of all counsel who participated in the trial of the case. We affirm the trial court's judgment.

### BACKGROUND

The State indicted appellant for the murder of his mother's boyfriend, Anthony Coleman. The evidence showed that at one time Coleman lived in the Diamond Creek Apartments in Dallas and had several friends who still lived there. After Coleman moved from Diamond Creek,

he walked to the apartments every day to check on Sharah Saber. Saber was 91 years old, disabled, wheelchair bound, and was "like the granny of the apartments." When the weather was nice, people would gather in and near the breezeway outside Saber's apartment.

Appellant and his mother and stepfather lived in St. Louis, Missouri. At some point, appellant's stepfather, Nick White, also known as Nickey Barnes, moved to Diamond Creek. White was disabled and confined to a wheelchair. He operated a "candy store" from his apartment and sold candy, soft drinks, chips, and the like. He also had a girlfriend who may have lived with him at the apartment.

In summer 2010, appellant's mother, Rosetta Barnes, moved to Dallas. The record does not state where Barnes lived, but the evidence showed that the residents of Diamond Creek knew of her and that she came from Missouri. Barnes began dating Coleman about a month or two before Coleman was shot. The record is unclear when appellant arrived in Dallas; he brought his girlfriend and at least one child.

The evidence suggested that White had no problems at first with Barnes dating Coleman, and that White was "cool" about it because he had a girlfriend. The relationship changed, however, when White and Barnes's oldest daughter said she did not like Barnes dating Coleman and "cranked up everything." One resident, Tyrone Williams, testified that about a week before Coleman was murdered, White said he "was going to get his son to do something to" Coleman and was going to bring his son in from St. Louis "and kill the m[] f[]."

On the day of the murder, White wanted to go to the store for supplies for his candy store. Barnes usually drove him, but she was not available that day, and White was upset about it. The reason she was not available varied depending upon the witness. Dominick Harrell, Saber's grandson, testified that Barnes was at a motel with Coleman. Another resident said Barnes's car would not start. Saber asked her health care aide, Bobbie Jones, to take White and appellant to

the store. Jones testified that White told her he was upset because Barnes left their children at a pizza place and went to a motel with Coleman instead of waiting to pick up the children. He also said "he was going to f[] Anthony [Coleman] up."

When Jones, White, and appellant returned from the store, people were gathered by Saber's apartment, including Barnes and Coleman. White called Barnes over to the vehicle, and when she got there, they started fighting. White grabbed Barnes by the neck or collar and started hitting and choking her. Jones yelled at appellant to help his mother. Coleman also said something to White, and Saber told White "to stop that now." The fighting stopped, and Jones took White and appellant to White's apartment to unload the groceries. While still in the car, White kept telling appellant to "[g]et my m[] f[] gun." Meanwhile, Coleman asked Harrell for a gun. Harrell got his gun and gave it to Coleman. It was a .38 caliber revolver with two bullets. Coleman put the gun in the back pocket of his pants.

When Jones got back to Saber's apartment, she saw White coming back that way in his wheelchair with appellant walking behind him. Jones told "everybody to run because [she] thought [White] had a gun." Jones got Saber into her apartment and told Barnes and Coleman to run. By the time Jones got Saber into the bedroom, she heard White say, "Kill the m[] f[], kill the m[] f[]" and heard two gunshots. Barnes ran into Saber's apartment and said Coleman had been shot. Jones ran to Coleman; she saw a gun lying on the ground next to him.

Williams was in his aunt's apartment when he heard two gunshots. He looked out and saw Coleman lying on the ground, bleeding from the head, and ran to help him. As Williams was trying to help Coleman, he saw appellant standing by White's apartment with a lady and several children. He told "somebody to go get him" and appellant "took off running."

LaShay Osby, another resident, testified that the incident leading up to the shooting "was just a big argument." And "then all of a sudden, Nick was like 'Go get my m[] f[] gun,' and then

his son went and got the gun." Osby saw appellant leave and walk toward White's apartment, which was around the corner. When appellant came back, she saw him put a black gun in his pocket. Osby walked back into her apartment and then heard two gunshots. She went outside and saw Coleman lying on the ground bleeding from his head.

Harrell was also inside the apartment when he heard two gunshots. He opened the door and saw Barnes hollering and White sitting in the breezeway in his wheelchair. Harrell saw his gun lying next to Coleman and picked it up; it still had the two bullets in it. The next day, he told the police about the gun and gave it to them.

The residents described appellant to the police and told them he ran across the street. The police found him hiding behind the door of a laundry room at an apartment complex across the street. They also found a magazine with unfired cartridges under a cabinet in the laundry room, and an unfired cartridge on the ground outside the laundry room. The police found fired cartridge casings at the murder scene and a bullet that went through the window of a nearby apartment. The police arrested appellant for Coleman's murder. Appellant agreed to talk to the police, but he lied about his name and his date of birth. He denied any involvement in the crime and stated he was walking to Burger King when he heard the police arriving at the apartment complex. He said he was not at the apartment when the shooting occurred, he did not hear gunshots, and he did not run across the street.

In a telephone call from jail that same day, appellant told his girlfriend that the police "had found that sh[]" she brought to the laundry room. He told her she "should have left that m[]f[] where it was at." In the same call, appellant told White that his girlfriend "brought . . . a movie over to where I was at, and they found that m[] f[]." When White said, "It ain't gonna match" appellant said, "Yes it is." White asked how it was going to match, and appellant said, "Cause . . . you know it's two films to the movie right? . . . And she brought one of them." White

–4–

said, "I got the movie projector though." Appellant said, "I know. I had both the movie projector and both of the films. She brought it out though, talking about she was nervous." The detective testified that he thought the conversation was about the shooting, and the "movie projector" referred to the gun and the "films" referred to two magazines for the gun.

Coleman died three days later. The medical examiner testified that Coleman died from a gunshot wound to the head. He said the bullet entered Coleman's face, traveled through his brain, and exited out the back of his head. The murder weapon was never found. The firearm examiner testified that the cartridge casings and bullet found at the scene were shot from the same gun; she also testified that the cartridges in the magazine found near appellant in the laundry room were consistent with the fired cartridges at the crime scene. She testified that none of the fired or unfired cartridge casings found at the scene matched the revolver Harrell gave Coleman.

## SUFFICIENCY OF THE EVIDENCE

Appellant contends in his first issue that the evidence is insufficient to support the conviction. He argues that the evidence is insufficient because "[n]one of the witnesses who testified for the State actually saw the shooting," "[n]o weapon was ever recovered which could be the murder weapon," and "no objective evidence, such as fingerprints, connected Appellant to . . . the shooting."

### Standard of Review

When an appellant challenges the sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the

evidence when considered in the light most favorable to the verdict." *Id*. We presume the jury resolved all conflicts in the evidence in favor of their verdict. *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). This standard is the same for both direct and circumstantial evidence. *Id*.

**Applicable Law**

The indictment alleged that appellant committed murder by intentionally or knowingly causing the death of Anthony Coleman by shooting him with a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). Alternatively, it charged that appellant committed murder by intending to cause Coleman serious bodily injury and committing an act clearly dangerous to human life by shooting Coleman with a firearm thereby causing Coleman's death. *See id.* § 19.02(b)(2).

**Analysis**

The evidence showed that in the days or weeks before the murder White threatened to call his son from Missouri to "f[] up" Coleman. Appellant, White's stepson, came from Missouri a short time before the murder. On the day of the murder, several apartment residents witnessed a confrontation between White on the one hand and Coleman and Rosetta Barnes on the other in which White tried to choke Barnes. White told appellant to "go get my m[] f[] gun," and a resident saw appellant with a gun. Right before the gunshots, Jones heard White say, "Kill the m[] f[], kill the m[] f[]." Immediately after the gunshots, a resident looked out and saw two people: Coleman lying on the ground and appellant running away. Another resident looked out and saw White sitting in his wheelchair near the breezeway and testified that it would have been impossible for White to shoot Coleman and get back to the breezeway in a wheelchair in the length of time between the gunshots and when the witness looked out and saw White in the breezeway. The residents saw appellant run across the street. The police found appellant hiding

in an apartment complex across the street. They found a magazine for a gun nearby. The magazine contained unfired cartridges consistent with the cartridge casings found at the crime scene. A live, unfired cartridge, which also matched the cartridges in the magazine, was found on the ground outside the room in which appellant was hiding.

During the interrogation, appellant lied about his name, denied being at the scene, denied running across the street, and denied shooting Coleman. In a phone call from jail the same day as the murder, appellant talked to White about "films," a "movie" and a "movie projector," how he "had both the movie projector and both of the films" because his girlfriend "brought it out [because] she was nervous," and how the "movie" was "gonna match." Appellant told his girlfriend during the same telephone call that the "stuff you brought to the laundry mat, they found that sh[]" and "You should have left that m[]f[] where it was at." When the girlfriend said "it was only one," appellant said, "I know, that's what made it look like I did it." The jury could have reasonably concluded that the conversation between appellant and his stepfather and girlfriend was not about movies and was really about the shooting. The jury also knew that White had disappeared and had not been apprehended.

Although no one actually saw who shot Coleman, the inferences necessary to establish appellant's guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *See Wise*, 364 S.W.3d at 903. Consequently, viewing the evidence under the appropriate standard, we conclude that it is sufficient to sustain the conviction. We resolve issue one against appellant.

### REQUEST FOR CURATIVE INSTRUCTION AND MISTRIAL

Appellant argues in issues two and three that the trial court erred by denying a curative instruction and a mistrial after sustaining his objection to an improper question and answer.

Detective Carroll initially investigated the offense until it became a homicide. During the State's direct examination of the detective, the prosecutor played the videotaped interrogation of appellant for the jury. In the interrogation, appellant admitted that he lied to the detective about his name and that he gave the name of his five-year-old brother to the detective. During the almost two hours of interrogation, appellant consistently denied any involvement in the murder, denied hearing gunshots, and said he was walking to Burger King when he saw officers arriving at the Diamond Creek Apartments. On cross-examination of the detective, defense counsel established that one reason a person might deny committing an offense "is because they'd be telling the truth[.]" On the State's redirect examination of the detective, appellant objected to the following question and answer as invading the province of the jury to determine matters of credibility:

> Q.     Then Defense counsel spent some time talking to you about the defendant's statement. Obviously, if the defendant was telling the truth – he mentioned that to you – then self-defense wouldn't be an issue in this case; is that right?
>
> A.     Correct.

The trial court sustained appellant's objection, but denied his request for an instruction to disregard and motion for mistrial.

**Standard of Review and Applicable Law**

Error occurs when a court sustains an objection but fails to give a requested instruction to disregard. *See Moreno v. State*, 821 S.W.2d 344, 354 (Tex. App.—Waco 1991, pet. ref'd). This error does not rise to the level of constitutional error and, as a result, we must disregard it if it did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Thompson v. State*, 95 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (explaining that constitutional error is error that "directly offends the United States Constitution or the Texas Constitution, without regard to any statute or rule that might also apply" and "is constitutional error only if the

correct ruling was constitutionally required"). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Scales v. State*, 380 S.W.3d 780, 786 (Tex. Crim. App. 2012) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)).

"A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id*. We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Id*.

## Analysis

Appellant argues that the trial court erred by refusing to instruct the jury to disregard the question and answer. He argues that as a result of the error the jury was "free to consider this evidence without limitation." We presume that by "evidence" appellant means the detective's testimony that if appellant was truthful during his interrogation about not being involved in the offense, appellant would have had no reason to tell the detective that he shot Coleman in self-defense. But self-defense was not an issue in the case, and appellant does not argue how considering the evidence "without limitation" harmed his substantial rights.

Appellant also contends that the trial court abused its discretion by denying a mistrial because the question asked for "improper opinion testimony" and "allowed [the prosecutor] to impugn Appellant's truthfulness [and] to elicit the testimony that the detective believed Appellant had lied in his interview with the police." Appellant did not object to the question on the basis that it was improper opinion testimony, and that issue is not preserved for our review. TEX. R. APP. P. 33.1. Additionally, the jury watched the entire interrogation and heard appellant

admitting that he lied about his name. The jury could have reasonably concluded, based on its own viewing of the interrogation, that appellant's denial of involvement was inconsistent with a theory of self-defense. Consequently, we conclude that the error did not affect appellant's substantial rights and the trial court did not abuse its discretion by denying a mistrial.

We resolve issues two and three against appellant.

## JAIL PHONE CALL

Issues four through six involve alleged errors in the admission of testimony about a recorded jail telephone conversation between appellant and his stepfather, White. Appellant argues that the trial court abused its discretion by permitting the detective to interpret "codes" allegedly used by appellant in the call. He also argues that the trial court abused its discretion by refusing to instruct the jury to disregard the detective's testimony about whether appellant showed fear or remorse during the call.

### Standard of Review

Trial courts are in the best position to determine questions about admissibility of evidence, and, as a result, we must review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). We will uphold the trial court's ruling if it is reasonably supported by the record and correct under any theory of law applicable to the case. *Laney*, 117 S.W.3d at 857; *Willover*, 70 S.W.3d at 845. Generally, error in a trial court's evidentiary ruling is nonconstitutional error, which we review under rule 44.2(b). *See Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007).

**Analysis**

Appellant called his girlfriend, Kenya Hamm, and White from jail and the call was recorded. The State played the recording for the jury. Appellant complains about the following conversation with White:

Appellant: Kenya's a[] brought um (inaudible) a movie over to where I was at, and they found that m[] f[].

White: It ain't gonna match?

Appellant: Yes it is.

White: How?

Appellant: Cause it's, it's, uh, it's, you know it's two films to the movie right?

White: Yeah.

Appellant: And she brought one of them.

White: I got the movie projector though.

Appellant: I know. I had both the movie projector and both of the films. She brought it out though, talking about she was nervous. But sh[], I believe they gotta go question dude though, he's gonna tell you (inaudible), I'll probably get out.

*Interpretation of Call*

The State asked Detective Carroll whether he understood what the two were talking about. Appellant objected that the question called for speculation and invaded the province of the jury. The trial court overruled appellant's objections, and the detective testified that he understood "films" to refer to the magazine for the gun, "movie projector" to refer to the gun, and "she brought one of them" to refer to appellant's girlfriend bringing a magazine for the gun to the laundry room where appellant was found hiding.

On appeal, appellant argues that the testimony was inadmissible under evidence rule 702 because the State did not proffer or qualify Detective Carroll as an expert in interpreting codes. But appellant did not object to the testimony on expert-witness grounds, and that issue is not

–11–

preserved for our review. *See* TEX. R. APP. P. 33.1(a); *Guevera v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003) (argument on appeal must comport with objection at trial).

Appellant also argues that the detective speculated about the meaning of the conversation and "had no logical basis on which to premise his testimony." He argues that the testimony was not harmless because it "clearly placed a weapon in Appellant's hands and strongly inferred that Appellant thereafter concealed that weapon and evidence that could connect him to that weapon." He contends that the State used the testimony to argue that appellant "was a calculating person," was "the actual shooter, not just a party to the shooting," and "obstructed justice by hiding the gun."

Detective Carroll testified that during his investigation he talked to appellant, his girlfriend, and residents of the complex. He testified that he learned the police found appellant hiding in a laundry room across the street and a loaded magazine for a gun near appellant, that residents at the apartment complex heard White arguing with Coleman earlier, that a resident had seen appellant with a gun, that a witness heard White say "kill the m[] f[]," that another resident had seen appellant running from the area immediately after Coleman was shot, that appellant ran when chased, and that White had not been apprehended. The detective also knew that the phone call was made on the day of the shooting soon after appellant's arrest.

We conclude, based on the detective's investigation and the information he knew when he listened to the recorded jail telephone call, that he had a "logical basis on which to premise his testimony" and the testimony was not based solely on speculation. As a result, the trial court did not abuse its discretion by overruling appellant's speculation objection. *See Madrigal v. State*, 347 S.W.3d 809, 813–14 (Tex. App.—Corpus Christi 2011, pet. ref'd).

But even if it was error to admit the detective's testimony about "codes" used during the telephone conversation, appellant has not shown how the error "had a substantial and injurious

effect or influence in determining the jury's verdict." *See Scales*, 380 S.W.3d at 786; *Walters*, 247 S.W.3d at 218. The jury heard the telephone conversation and could draw its own conclusion about the meaning of the words used. We resolve issue four against appellant.

### *Fear and Remorse*

Appellant contends in issues five and six that the trial court erred by refusing to instruct the jury to disregard the following questions and answer about appellant's demeanor while talking to his girlfriend and White:

> Q. Now, did – Detective, was there anything in that call where the defendant seemed scared?
>
> A. Not at all.
>
> [Speculation objection sustained. Request to instruct the jury to disregard denied.]
>
> . . .
>
> Q. Did [appellant] seem concerned or remorseful about what had happened?
>
> [Speculation objection sustained. Request to instruct the jury to disregard denied.]

The first objection about whether appellant "seemed scared" was untimely because it was made after the witness answered, and appellant has not shown that he had a legitimate reason for the delay in making the objection. *See Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995). However, assuming it was error for the trial court to refuse the requested instruction to disregard, appellant must show that the nonconstitutional error affected his substantial rights. *See* TEX. R. APP. P. 44.2(b); *Scales*, 380 S.W.3d at 786; *Walters*, 247 S.W.3d at 218.

The question did not ask the detective whether appellant was scared, but whether he "seemed scared" during the phone call—it asked about the detective's opinion or perception of appellant as the detective listened to the call. The State played the call for the jury, and the jury could determine for itself whether appellant "seemed scared" during the call. And appellant has not argued how the fact of being scared, or not, impacted the jury's determination of guilt. We

have fair assurance that the error did not influence the jury, or had only a slight effect. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). We resolve issue five against appellant.

The second objection was timely, and because the objection was sustained, the detective did not answer the question about whether appellant seemed remorseful while talking to his girlfriend and White on the telephone. Appellant argues on appeal, however, that the jury was "free to consider this evidence without limitation" because the trial court refused to instruct the jury otherwise. But there was no evidence to consider "without limitation" because the witness did not answer the question. Additionally, the jury heard the telephone call and could have determined on its own whether appellant expressed remorse during the conversation. Consequently, we conclude that appellant has not shown how he was harmed by the question, and we resolve issue six against him.

### MODIFICATION OF JUDGMENT

In issues seven and eight, appellant contends that the judgment should be modified to reflect the names of both prosecuting attorneys and both defense attorneys involved in the trial. The State argues that the judgment is not incorrect because it reflects the names of the lead prosecutor and defense attorney.

The Texas Code of Criminal Procedure states that a judgment shall reflect "[t]hat the case was called and the parties appeared, naming the attorney for the state . . . and the attorney for the defendant[.]" TEX. CODE CRIM. PROC. ANN. art. 42.01, § 1(2) (West Supp. 2012). Here, the judgment reflects the name of the lead State's attorney, Jennifer Bennett, and the lead defense attorney, Bernard Sutherland. Appellant argues that it should also reflect the names of trial co-counsel for the State, Marc Moffitt, and appellant, Terry Hill. However, the record shows that at various times there were other attorneys who represented the State in pretrial matters, and there

–14–

were times in which Terry Hill did not appear as co-counsel for appellant. The judgment accurately reflects the names of lead counsel, and we decline to modify the judgment. We resolve issues seven and eight against appellant.

## CONCLUSION

Having decided all of appellant's issues against him, we affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120221F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANTWON IRVING aka RAKIM BARNES,
Appellant

No. 05-12-00221-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 7, Dallas County, Texas
Trial Court Cause No. F10-62755-Y.
Opinion delivered by Justice Lang-Miers,
Justices Murphy and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 23th day of May, 2013.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE